[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Atty. Michelle Casavant — Mother Atty. Jacqueline Wilson — Child Atty. Joann Steinkamp — Father Atty. Linda P. Prestley — AAG
MEMORANDUM OF DECISION NATURE AND HISTORY OF PROCEEDINGS
This is the case of Jaime C. who has been in hospital and/or foster care for all of the 13 months of his life. Jaime is the subject of coterminous petitions which were filed by the Commissioner of the Department of Children and Youth Services ("DCYS") September 22, 1989. The termination petition was last amended on September 4, 1990. The neglect petition has not been amended. The petitions allege that the child is neglected and uncared for and seek to terminate the parental rights of his parents on the grounds of: (1) abandonment; (2) no ongoing parent-child relationship; (3) acts of commission or omission.
On September 4, 1990, the date of trial, the respondent father entered a written plea of nolo contendre as to the neglect and uncared-for petition.
FACTS
Evidence offered at trial, interpreted in the light of the prior record in this court concerning this child, of which the court has taken judicial notice, permits the finding of the following facts:
The record in this case is replete with instance after instance of the respondent mother, Susan T., abusing alcohol prior and subsequent to the birth of her child and continuing until the last reported incident just three weeks before the trial of this matter. Susan has been admitted to the Blue Hills Hospital for treatment of alcoholism a total of 17 times since 1982. Seven of those admissions where between July, 1989 and August, 1990, with the last admission being on August 15, 1990, just 20 days prior to the beginning of this trial. In addition, she has been arrested or otherwise referred to law enforcement authorities numerous times over the years, some involving violent behavior, as the result of her intoxication.
Susan continued to consumed alcohol throughout her pregnancy with Jaime. She was seen at the Manchester hospital on July 1, 1989 in an intoxicated state and was admitted to the Blue Hills Hospital alcohol detoxification program twice during the month preceding the birth of the child.
Mother has been treated for her alcoholism on numerous occasions. On February 6, 1990, at the request and with the help of DCYS, she entered the Boneski Hospital for alcohol treatment where she remained until March 6, 1990. Yet, on March 7, 1990, the day following her release from that program mother was brought to a hospital in an intoxicated state. Three days later her condition was so bad that she was sent to Fairfield Hills for alcohol detoxification.
Mother entered the Beech Hill alcohol treatment program as an inpatient CT Page 2480 from June 27, 1990 until July 20, 1990. Two weeks following her discharge from that program she again had to be hospitalized and detoxified due to alcohol abuse.
Based upon the totality of this evidence the Court finds it to be clearly proven that mother suffers from chronic alcoholism, that she has been unable to control her drinking since the birth of Jaime, and that she is unable to control her abuse of alcohol at this time.
Jaime C. was born at the Danbury Hospital on August 9, 1989, with numerous physical problems which required medical intervention. He was ten weeks premature, weighing only 3 lbs., 3 oz. There is no evidence that Jaime had any traces of alcohol or any narcotic substance in his system at the time of his birth. Jaime remained in the Danbury Hospital special care nursery for twenty-three days and was discharged from the hospital to foster care, pursuant to an order of temporary custody, on September 25, 1989. (Petitioner's exhibit #7). He has remained in foster care ever since that date.
Mother was discharged from the hospital on August 12th. She visited with Jaime only once, on August 19th, during the first three weeks following his birth. However, she visited with him on five additional times in September prior to his discharge from the hospital on September 25, 1989. (Pleadings of Petitioner).
Mother was reported to have been drinking up to a quart of vodka daily subsequent to her discharge from the hospital on August 12, 1989. (Exhibit #6). Police were called to her residence on August 15 and August 22, 1990 regarding complaints of domestic disputes. They reported that mother had been drinking on each occasion. (Exhibit #17 and #18). Susan finally admitted herself to the Blue Hills detoxification program on September 6, 1989.
Mother was found unconscious, in an intoxicated state, in a Manchester restaurant on October 1, 1989. (Exhibit #16). Testimony from Dawn Hoblet of the Manchester Hospital was that mother's blood alcohol level on that occasion was .500. In addition, she has been found to have blood alcohol levels on excess of .450 on several occasions over the past year while being treated at the Manchester Hospital for intoxication.
Mother was also homeless in September, 1989. She was living in a motel room supplied by the Department of Income Maintenance.
According to testimony by Jaime's pediatrician, Dr. Indrani Saini, whose testimony the court finds credible, Jaime is suffering from neurological deficiencies, cerebral palsy, and developmental delays. He is exhibiting more and more symptoms as he gets older, and at one year of age he has the physical development of a six month old child. He can not stand, he cannot feed himself and he has difficulty even in holding his head up without support. Jaime is a special needs child whose needs will increase as he CT Page 2481 gets older. Jaime will probably be retarded, although an objective evaluation of his cognitive skills can not yet be made.
According to Dr. Saini, the child most probably suffered "some insult" while in utero which resulted in his current physical condition. She testified that mother's alcohol use could have been the cause of the problem and that alcohol might have resulted in the symptoms observed in Jaime. (Emphasis added).
Dr. Robert Greenstein, M.D., Professor of Pediatrics at the University of Connecticut School of Medicine, also examined and evaluated Jaime and concluded that mother's alcohol abuse during pregnancy could have effected Jaime's brain development. (Emphasis added). He determined that Jaime did not exhibit the overt features of the fetal alcohol syndrome, but noted that the child was born 10 weeks premature and "has a transitional neurological examination that accompanies his prematurity". (Petitioner's exhibit #3).
Dr. Rowe of the University of Connecticut Premature infant Clinic concluded that while the child's condition was symptomatic of fetal alcohol abuse, Jaime did not manifest the usual "stigmata" of fetal alcohol syndrome. (Petitioner's Exhibit #3). "[T]he degree of retardation which this child seems to be demonstrating may well be due to the influence of the prenatal exposure to alcohol since it is not accountable from the events which occurred following his premature delivery". (Emphasis added). Dr. Saini testified, however, that there are causes other than excessive alcohol consumption during pregnancy which could cause Jaime's condition.
Testimony was received from Jaime's foster mother who indicated that mother has visited with Jaime on 45 of the 109 scheduled visits since the child was placed with her on September 25, 1989. Mother usually does not call to cancel the visits, she simply does not show up. "The visits mostly went well", except for two occasions when Susan was intoxicated when she arrived and the visit was not allowed by the foster parents. Those two incidents were on October 9, 1989 and January 26, 1990.
According to the foster mother, Jaime, although one year old, looks and acts like a 5 to 6 month old infant. She believes that Jaime is too young to know that Susan is his mother. Jaime considers his mother to be just another person who visits, and he responds to her in the same friendly manner in which he responds to other visitors. Susan does not ask many questions of the foster mother about Jaime's physical condition or treatment during the visits. Mother did not visit with the child for the three weeks preceding the date of trial and her visits over the past few months have been somewhat sporadic.
PROCEDURE TO BE FOLLOWED
Where neglect and termination petitions are coterminously filed under section 17-43a(e), the court is required to proceed in three separate stages. CT Page 2482
First — Adjudication of the neglect petition.
The court must determine, by fair preponderance of evidence, if the child has been neglected or uncared for as of the date the petition was filed or was last amended. Neglected includes abused as that term is defined under the statutory definitions found in Section 46b-120 and Section 17-38a(b). If the petitioners evidence does not support such a finding, then both petitions must be dismissed since both are based upon the same alleged facts. If the court finds the child to have been neglected or uncared for, disposition will be deferred until a decision is rendered on the termination petition.
Second — Adjudication, termination petition.
The court must next determine whether the evidence provides clear and convincing proof that any pleaded ground exists to terminate the parent's rights. If no such ground is found, the court must return to the neglect petition to consider an appropriate disposition. If grounds to terminate are found, must move to the final stage.
Third — Disposition, both petitions.
If grounds are found to both adjudicate the child neglected or uncared for and to terminate the rights of the parents, the court must then consider whether the facts as of the date of disposition — the last date of hearing — support by clear and convincing proof after consideration of the six factors enumerated in Section 45-61f(h), that such termination is in the child's best interest. If the court does not find that the child's best interests would be served by terminating the parent's rights it must return to and dispose of the neglect petition. If the court does find that termination serves the child's best interests, an order may issue terminating the parent's rights.
NEGLECT/UNCARED-FOR PETITION — facts as of September 22, 1989.
The petition filed by DCYS on September 22, 1989 alleges Jaime to be a neglected child. Included among the grounds for neglect were allegations that the child had been emotionally maltreated and denied proper care and attention emotionally.
The petitioner has not produced sufficient evidence to prove, even by a fair preponderance standard, that Jaime has suffered any emotional maltreatment or has been denied and emotional care and attention.
When considering a neglect or uncared-for petition the focus of the court's attention must be the effect upon the child. In this case, the fact that his foster mother rather than his natural mother has been caring for Jaime is of no concern or interest to a child of his age. There is no evidence that he knows that the person providing for his needs is not his CT Page 2483 natural mother or, even if he did know, that it would make any difference to him or effect him emotionally. The totality of the evidence in this case concerning Jaime's emotional condition is inadequate for the court to conclude that the petitioner has sustained her burden as to emotional neglect.
Additionally, the Court does not find that Jaime was abandoned. The petition itself indicates that mother visited the child in the hospital six times. That may not be enough, but it certainly negates a claim of abandonment as of the date the petition was filed.
It is clear, however, from the weight and sufficiency of the evidence, that as of the date of the petition Jaime was an uncared for child and would likely be subjected to neglect if placed in the custody of his mother.
Because of her continued alcoholism, mother was not on September 22, 1989, is not now, nor has she ever been in a position to be able to care for Jaime. This is a child who is not only an infant, requiring the special care needed by all infants, he is also suffering from severe physical and probably intellectual deficiencies requiring even greater specialized care.
Mother has been unable to provide a home for Jaime, and due to her frequent alcoholic episodes she was and continues to be unable to care for the child. Consequently, the Court finds that the petitioner has proven by a fair preponderance of the evidence of the evidence that Jaime was uncared-for at the time the petition was filed in that his mother was unable to provide him with a home and/or the specialized care which his physical, emotional or mental condition requires. The situation has not changed in the year since the petition was filed with respect to mother's ability to care for this child. Jaime is therefore adjudicated to be an uncared-for child.
ADJUDICATION — TERMINATION PETITION — facts as of September 4, 1990
Since termination of parental rights is the ultimate interference by the state with the natural rights of parents in their children, resulting in an everlasting severance of the legal relationship, and usually the permanent separation of parent and child as wall, courts must require strict adherence to statutory standards." In re Migdalia M.,6 Conn. App. 194, 203 (1986).
ABANDONMENT:
The Connecticut General Statutes sections 17-43a(b)(1) defines abandonment as the parents failure "to maintain a reasonable degree of interest/concern or responsibility as to the welfare of the child."
 "Where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child and no concern for the child's welfare, statutory abandonment has CT Page 2484 occurred." In Re Rayna N. 13 Conn. App. 23, 36 (1987).
The Court is unable to find that the petitioner has proven this ground for termination by clear and convincing evidence. While it is true that mother has visited with Jaime for only approximately one half of her scheduled visits, and has not visited during the three weeks immediately preceding the trial the fact of the matter is that she visited with Jaime 45 times over the past year which is an average of almost once per week. Although mother has not expressed concern to the foster mother regarding the child's well being, that by itself, taking into consideration the number of times mother visited with the child, is not enough to satisfy the petitioner's burden of proving statutory abandonment by clear and convincing evidence.
NO ONGOING PARENT — CHILD RELATIONSHIP:
Section 17-43a(b) of the Connecticut General Statutes defines this ground as the absence of an:
". . . ongoing parent-child relationship which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or re-establishment of such parent-child relationship would be detrimental to the best interest of the child."
This ground for terminating parental rights does not allege a lack of love for the child, rather it is concerned with the relationship that ordinarily develops, and should exist between parent and child, as the result of the parent having met the day to day physical, emotional, moral and educational needs of the child. The relationship does not exist in this case.
Mother has never met the day to day needs of this child. She has never cared for or even been alone with Jaime subsequent to the day of his birth some 13 months ago.
While there has been no clinical evidence presented to the court concerning the relationship between mother and child, the court takes special notice and gives weight to the fact that the foster mother on this case has been a foster mother to 107 children over the past 24 years. She has observed the interaction of Susan and Jaime during the course of the 45 visits during the past year and testified that Jaime does not recognize Susan as his mother. He does not respond to her or her presence any differently than he does to any other person. He does not appear to have any emotional feelings or ties with his natural mother as no relationship has ever developed between them. That is certainly evidence that there is no parent-child relationship in this case. See: In Re Juvenile Appeal (84-6),2 Conn. App. 705 (1984); In Re James T., 9 Conn. App. 608, 616 (1987). CT Page 2485
Even though no parent-child relationship exists, that alone is not ground to terminate a parent's rights. The court must also find by clear and convincing proof that to permit further time to establish such relationship would be detrimental to the best interest of the child.
While mother does visit with Jaime, she has never sought to be involved in Jaime's treatment or the planning for his future needs. She does not inquire of the child's caregivers about Jaime's care, treatment or condition. Given mothers history of alcohol abuse of the past eight years, her inability to overcome her alcoholism despite repeated hospitalization for detoxification and treatment, her inability to stop drinking even though she knew that it was likely to result in the termination of her parental rights to her child, it is reasonable and permissible for the Court to predict and conclude that this pattern of behavior is likely to continue into the foreseeable future.
Jaime, on the other hand, is a special needs child who may be adoptable at this time in his life but will become progressively less as time goes on. He needs a permanent, secure, nurturing and caring home now. It would clearly and convincingly be detrimental to Jaime's best interest to require him to wait to determine whether his mother will rehabilitate to the extent that she can develop a relationship with and care for him.
ACTS OF COMMISSION OR OMISSION:
In order to terminate mothers parental rights on the ground of acts of commission or omission under Section 17-43a(b)(3) the Court must clearly and convincingly find that the child was, or will be, denied the care, guidance or control necessary for his physical, educational, moral or emotional well-being as the result of an act or acts of commission or omission by the mother. (Emphasis added.).
Jaime is chronologically 13 months old with a developmental age of approximately 6 months. At the age of one year Jaime is incapable of making moral judgements, and there is no evidence that his educational needs have been compromised, therefore the Court must consider the effect of mother's acts of commission or omission on the child's physical and emotional well-being.
The petitioner urges the Court to hold the mother's excessive consumption of alcohol during her pregnancy was an act of commission resulting in the child being denied proper care necessary for his physical well being. While it is true that the evidence supports a finding that mother excessively consumed alcohol during her pregnancy, the evidence falls short of the clear and convincing proof needed to sustain the petitioner's with respect to this ground.
The medical evidence is far from clear or convincing that Jaime's condition if the result of alcohol abuse by mother. Dr. Saini's opinion is that more likely than not that Jaime's condition is the result of an CT Page 2486 utero insult, that opinion would, at best, support only a fair preponderance standard. In addition Dr. Saini expressed the opinion that excessive consumption of alcohol could or might have resulted in Jaime's condition. Dr. Greenstein and Dr. Rowe also expressed suspicion, concern and the possibility that excessive alcohol consumption by the mother resulted in the physical and developmental deficiencies which Jaime has and is experiencing. But these opinions express possibilities, not probabilities based upon reasonable medical certainty. Possibilities do not rise even to the level of a fair preponderance of the evidence.
This case is not similar to the so called "cocaine babies" cases cited by the petitioner in her brief. In those cases the children were born either with discernible traces of narcotic substances in their systems or exhibited clear symptoms of withdrawal. No such evidence was produced in this case.
Dr. Saini also testified in response to a question from respondent's counsel that there are causes for Jaime's condition, including the cerebral palsy, other than alcohol consumption during pregnancy.
It may well be that mother's excessive alcohol consumption during pregnancy resulted in the Jaime's condition but the weight and sufficiency of the evidence produced during the course of this trial does not convince the court clearly and convincingly of that fact.
The petitioner has proven by clear and convincing evidence that mother's acts of commission and omission subsequent to the birth of the child would in all probability be harmful to the child if he was in her care.
It is clear that mother is a chronic alcoholic who has had repeated referrals to hospitals for detoxification and treatment of acute alcoholism, and who has been involved in numerous instances of alcohol related involvements with the police, some of which involved violent behavior, subsequent to the birth of her child.
Mother has not made any progress in controlling her alcohol abuse, and as the result of her continuing abuse of alcohol mother has established a home or an environment where she can properly and safely care for her child. Even with the knowledge that such conduct might well lead to the termination of her parental rights, mother has created circumstances and conditional which preclude her from safely being able to have her child returned to her care. This has resulted in Jaime being denied the love and care which should be given to a child by his mother and forcing the state to intervene in Jaime's life so that the care, guidance or control necessary for his physical, educational, moral or emotional well being which she has failed to give him, can be met.
The public policy of this state is "to protect children whose health and welfare may be adversely affected through injury and neglect" (Sect. 17-38a) (Emphasis added). Mother, due to her alcohol abuse, can CT Page 2487 barely meet her own needs much less those of an infant with the special needs of this child. See: In Re Carl O. 10 Conn. App. 428 (1987). Susan's frequent alcoholic episodes, her inability to control her drinking and resulting behavior documented over the near and distant past, and especially subsequent to the birth of her child, are reasonably predicted to continue into the foreseeable future. The violent and uncontrolled behavior which she exhibits when she is intoxicated would clearly be harmful to a child of Jaime's age. Placing Jaime in such a situation, given his special needs, would be exposing him to unreasonable and dangerous risks. It would be reckless, irresponsible and clearly dangerous to the child's well being to permit him to be placed in the care of an alcoholic mother in order to prove whether he would in fact suffer any harm before deciding whether her parental rights should be terminated. It is the finding of this Court that the child would be in physical danger under the circumstances. Since mother is unable to care for herself during her alcoholic episodes, which the court finds clearly and convincingly are likely to continue, she clearly could not care for Jaime.
The Court finds based upon the totality of the evidence that despite repeated instances of medical intervention over the years, mother so lacks the ability to control her behavior with respect to her abuse of alcohol, and that her alcoholism is so debilitating, that she will not be able to provide Jaime, who is a special needs child, with the care, guidance or control necessary for his physical, educational, moral or emotional well being within the foreseeable future. It is, therefore, in the best interest of the child that mother not be permitted to exercise parental rights and duties with respect to this child as the child would clearly and convincingly be subject to neglect of returned to his mother.
Prior to determining whether to terminate the rights of a parent the Court is required to make six findings pursuant to Section 17-43a of the General Statutes of Connecticut.
(1) The most significant and important service offered to mother was referrals for alcohol treatment. She did avail herself of the inpatient treatment programs to which she was referred by DCYS, but, with no success in controlling her alcoholism. In addition, visitation was arranged between mother and child.
(2) The court orders were entered in this case. The only important expectation was that mother abstain from the consumption of alcohol which she did not do.
(3) The child has no emotional ties with his mother. He does not recognize Susan to be his mother, rather, he treats her as he would any visitor or stranger. There was no evidence produced that the child has any significant emotional ties with his foster mother.
(4) Jaime is approximately 14 months old with a date of birth of August 9, 1989. CT Page 2488
(5) Mother has not adjusted her conducted, conditions or circumstances over the past year to make it in the best interest of Jaime to return to her care. She continues to abuse alcohol to the point where she is unconscious, violent and requires hospitalization. The frequency and severity of these alcoholic episodes have not diminished over the years. While mother has visited with her child, she has only kept about one half of her scheduled visits. She has not been involved in the planning or treatment of Jaime, nor has she inquired about such matters with the child's foster mother.
(6) No one has prevented mother from seeing and establishing a relationship with her child. There is no evidence that her economic circumstances have been a factor in this case.
DISPOSITION — as of the date of trial:
There have been no positive changes in mother's life style since the birth of Jaime which could reasonably lead one to believe that she will ever be in a position to able to safely care for him. Having being in foster care all of his life, Jaime cannot afford to wait any longer for permanent, caring, and nurturing home where his special needs can be met and where he can develop to his greatest potential. The evidence presented to the Court in this case, as related supra, has clearly and convincingly established that it is in the best interest of this child to have his mother's parental rights terminated so that he can be placed in adoption.[1]
It is therefore ORDERED that the parental rights of Susan T. be terminated.
For the reasons stated within this memorandum the Court finds it to be in the best interest of Jaime, having been adjudicated to be an uncared-for child, to be committed to the custody of the Commissioner of the Department of Children and Youth Services for a period not to exceed 18 months, pending a decision regarding the termination of father's parental rights, and it is so ORDERED.
TERENCE A. SULLIVAN, JUDGE.